IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Robert Fauley, | ) | |
| | ) | Civil Action No. 6:05-3439-TLW-WMC |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits on September 12, 2002, alleging that he became unable to work on June 10, 2002. The application was denied initially and on reconsideration by the Social Security Administration. On July 10, 2003, the plaintiff requested a hearing. The administrative law judge, before

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

whom the plaintiff, his attorney, a vocational expert and a medical expert appeared, considered the case *de novo*, and on June 16, 2005, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended.  The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 18, 2005.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(1) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)    The claimant's Crohn's disease, depression, left knee problems, and right eye problems are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).
>
> (4)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P. Regulation No. 4.
>
> (5)    The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)    The claimant has the following residual functional capacity: to lift 20 pounds [occasionally] and 10 pounds frequently. He can sit for 6 out of 8 hours, stand 6 out of 8 hours, and in addition to standing, he can walk for 6 out of 8 hours with required sit/stand option. The claimant has the following additional limitations to occasionally climb, balance, stoop, kneel, crouch, and crawl. The claimant can perform one to two step instructions at unskilled work, nonpublic work, low stress and no work requiring frequently coordination with co-workers.

(7)    The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

(8)    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

(9)    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

(10)    The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

(11)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

(12)    Although the claimant's exertions' limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as tobacco sampler (DOT #529.587-022; with 230 jobs available in the state and 4,014 jobs available in the nation) and a carton packer (DOT #920.665-010; with 5,280 jobs available in the state and 275,000 jobs available in the nation).

(13)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments

which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 44 years old at the time of the ALJ's decision in this case. He has a high school education and has worked as a maintenance worker and a cable technician. The plaintiff alleges disability as of June 10, 2002, due to Crohn's Disease, depression, and problems with his left knee and right eye.

The record reveals that on April 27, 1998, the plaintiff was admitted to the Medical University of South Carolina Institute of Psychiatry for depressed mood and suicidal ideation. His GAF score was 41 (Tr. 191). His diagnoses at discharge included: (1) Axis I - rule out malingering vs. dysthymia vs. adjustment disorder with depressed mood; and (2) Axis II - rule out personality disorder (Tr. 170-79).

Progress notes dated May 04, 1998, indicate that the plaintiff presented for his initial mental health case management interview with the VA for follow-up from the above admission to the Institute of Psychiatry. He was diagnosed with adjustment disorder with mixed emotional features as well as possible major depressive disorder, which was to be ruled out (Tr. 248-49).

On May 18, 1998, the plaintiff returned to the VA for follow-up for his depression. He reported improvement in his symptoms and appeared to be doing well (Tr. 246).

The plaintiff presented to MUSC Emergency Care on August 12, 1998, for evaluation of homicidal thoughts and aggressive behavior. Consult was obtained with a psychiatrist who agreed that the plaintiff was having active homicidal thoughts and was a risk to others. The plaintiff admitted for inpatient treatment at the VA psychiatry ward on August 13, 1998, with preliminary diagnoses of homicidal ideation and depression (Tr. 200-01). He was diagnosed with adjustment/personality disorder, diarrhea, headaches, alcohol dependence in remission, and angry, threatening behavior. He refused medication and was told that he should seek supportive psychotherapy to help him cope with his problems. He was discharged on the same day (Tr. 239-43).

On September 09, 1998, the plaintiff returned to VA Mental Health for follow-up. He was noted to have constant headaches and diarrhea. He exhibited a broad affect and was slightly irritable. The plaintiff was noted to be angry over not having received a

6

Gulf War exam and felt his problems were a result of Desert Storm.  He was diagnosed with adjustment disorder and prescribed Zoloft (Tr. 234).

The plaintiff returned to the VA Mental Health for follow-up on September 24, 1998.  It was noted that his affect was angry and his mood irritable.  The plaintiff had discontinued his Zoloft because it caused his headaches to worsen and made him feel restless.  His thoughts were concrete and at times very unreasonable.  The plaintiff expressed anger and became argumentative about his care.  He became increasingly agitated stating that he felt like medications were being forced upon him and that it would be the clinic's responsibility if these medications prevented him from becoming employed or caused him to "hit a child."  He was diagnosed with major depressive disorder, and borderline personality disorder/mixed personality disorder was to be ruled out. Dr. Miriam F. Deantonio noted in an addendum to the above progress note that no medications were dispensed and that the importance of the plaintiff's cooperation with his treatment was expressed to him (Tr. 224-25).

On December 2, 1998, the plaintiff was admitted to the VA for dehydration after being taken via ambulance to Roper Hospital.  He presented with polyarthralgias, weakness, and chronic diarrhea and headaches resulting in severe photophobia.  On December 4, he was seen by Mental Health and noted to have an angry mood, having stated that the visit by Mental Health agitated him.  The plaintiff expressed outrage and threatened to return to the VA hospital with "channel 5 news" if he did not "get satisfaction regarding his Gulf War Syndrome."  It was noted in the report that he had recently undergone a Gulf War exam and that no syndrome or disease process was discovered. Dr. Deantonio noted in an addendum to this report that the plaintiff continued to be frustrated over what he felt was the caretaker's inability to identify a medical disorder that explained his symptoms.  Dr. Deantonio opined that in the absence of documented

7

abnormal pathophysiology, it appeared that the plaintiff was suffering from somatoform disorder and mixed personality disorder (Tr. 220-22).

The plaintiff returned to the VA Mental Health Clinic on April 28, 1999, at which time it was noted that his mood had worsened since his last visit and that he was only getting 2-3 hours of sleep per night.  The report also noted that the plaintiff had angry outbursts with his coworkers and fiancee and that he was easily frustrated.  The plaintiff was prescribed Klonopin.  The plan was to work on coping skills and stress management once his agitation was under control (Tr. 220).

The plaintiff returned for follow-up on May 19, 1999, with restricted affect, dysphoric mood, and complaints of drowsiness and heavy sedation from his medication. The plaintiff continued to suffer from chronic diarrhea, headaches, and muscle pain.  His wife accompanied him to this visit, stating that the plaintiff continued to have insomnia and nightmares (Tr. 207).

On June 09, 1999, the plaintiff underwent an endoscopy after continued complaints of watery diarrhea, arthralgias, and headaches.  The microscopic diagnoses this day included: (1) chronic ileitis suggestive of Crohn's Disease; (2) mild inflammation of the ascending colon; and (3) mild inflammation of the transverse colon (Tr. 211).

The plaintiff presented for follow-up on September 1, 1999.  It was noted there was no change in his symptoms at this point (Tr. 206).

On October 7, 1999, the plaintiff returned to the mental health clinic with continued complaints of chronic diarrhea, insomnia, and daytime fatigue.  His affect continued to be restricted and his mood sullen (Tr. 206).

The plaintiff presented for recheck again on October 7, 1999, with a broader affect and a more engaging mood.  He continued to complain of chronic headaches and back pain, but was taking medications as prescribed (Tr. 205).

8

The plaintiff returned on October 28, 1999, for follow-up.  It was noted that he moved slowly and with difficulty due to pain in his knees.  His assessment remained unchanged from prior visits (Tr. 203-05).

On November 10, 1999, the plaintiff returned with continued headaches and joint pain.  He expressed frustration over the lack of resolution.  He was noted to limp.  His wife reported that he continued to wake up "swinging his fists and yelling."  His assessment remained unchanged (Tr. 203).

The plaintiff was screened for post-traumatic stress disorder (PTSD) on December 23, 1999.  The social worker noted that the plaintiff flushed and put his head in his hands and wept when remembering the death of his partner during the war.  Upon examination, he was downcast and unsmiling.  The plan was to rule out PTSD.  It was noted that the plaintiff's major depressive disorder was exacerbated by his deteriorating physical condition (Tr. 202).

On January 7, 2000, the plaintiff presented for follow-up with a restricted affect, an anxious, irritable mood and increased short-term memory deficits.  His wife stated that the plaintiff continued to have chronic fatigue, insomnia, and nightmares.  The plaintiff began yelling and cursing and stormed out of the office.  Three days later, he returned to the VA clinic complaining of anal pain with tenderness upon sitting.  Examination revealed tenderness to palpation between gluteal folds (Tr. 296-97).

The plaintiff returned again on January 22, 2000, with continued rectal pain and skin lesion on his right lower leg.  On February 11, 2000, he requested a refill on his Clonazepam to treat his anxiety (Tr. 294).

Dr. Deantonio and his staff met with the plaintiff and his wife on February 16, 2000, in an attempt to come to an agreement that would satisfy the plaintiff regarding his care.  The plaintiff's behavior was escalated and angry about his treatment with Ms.

Thompson and he stated that he would never see her in follow-up again.  The plan was to try and find the plaintiff a new case manager (Tr. 290-92).

The plaintiff returned on March 24, 2000.  He was noted to walk slowly with apparent pain to his joints.  He stated that his impairments were too severe for him to work. He continued to express frustration that his impairments had not yet been treated to his satisfaction.  The counselor reviewed the concept of borderline personality and its typical associated problems (Tr. 287).

On March 27, 2000, the plaintiff returned for a complete military history review. He was noted to have insomnia, nightmares, and sometimes hits his wife in his sleep.  He dated his difficulties back to 1980 when he heard a friend in the military get decapitated during a train accident.  The plaintiff had intrusive, bothersome thoughts of this event and was sad and tearful when discussing it.  He reported hyper arousal and symptoms of decreased concentration as well as irritability.  The plaintiff reported that his symptoms had worsened over the last six months.  The plaintiff's mood was noted to be depressed upon examination with a somewhat restricted affect except when discussing his friend's death. He was also noted to walk slowly with a notable limp.  Dr. Jeffrey P. Lorberbaum's impression was probable PTSD, depression NOS, rule out dysthymia or major depressive episode, chronic, as well as borderline personality (Tr. 281-84).

The plaintiff was committed to the VA Psychiatry Department on June 9, 2000. It was noted he had a history of psychiatric inpatient stays.  The plaintiff stated that tension was very high at home secondary to financial restraints.  He had an argument with his wife and lost control.  He stated that his depression made him very angry.  The plaintiff stated that he saw things/people in the periphery about twice per day, a couple of times per week. The plan was to continue mood stabilizers and Crohn's Disease medications while in the hospital. Medications included Klonopin, Pentasa, Baclofen, Prednisone, and Tegretol. His diagnoses were adjustment disorder with mixed conduct and mood disturbance, antisocial

10

and borderline traits, Crohn's Disease (diagnosed in 1999), chronic headaches, and arthralgia (Tr. 250-56).

The plaintiff was evaluated by the South Carolina Vocational Rehabilitation Department on February 2, 2001. He was noted to have the following functional limitations: (1) emotional instability; (2) poor coping skills; (3) possible requirement of excessive emotional support from supervisors/co-workers; (4) mood swings; and (5) uncertainty regarding future vocational objectives. The diagnostic impressions were major depressive disorder; adjustment disorder with mixed disturbance of emotions and conduct; and antisocial and borderline traits (Tr. 300).

On July 12, 2001, the plaintiff was diagnosed with peri-anal Crohn's Disease and extensive ileal disease, with fatty liver. A small bowel follow-through was recommended (Tr. 443).

The plaintiff underwent a small bowel follow-through on July 23, 2001. The findings were compatible with a Meckel's diverticulum within the right quadrant. There was a featureless terminal ileum with fairly normal motility, which was compatible with the history of Crohn's Disease (Tr. 438-39).

On August 20, 2001, the plaintiff presented with continued difficulty sleeping. His Tegretol was increased (Tr. 436).

The plaintiff returned on October 15, 2001, complaining that his Crohn's Disease had worsened over the last few weeks. He was told to continue present management for this and for his PSTD and Major Depressive Disorder (Tr. 434).

On October 24, 2001, the plaintiff was admitted to hospital as he posed a significant danger to self. He had persistent suicidal ideation with concrete plans. He stated that his suicidal ideation started that morning after his wife blamed him for their eviction from their home the day before. He endorsed peripheral visual hallucinations as well as feelings of hopelessness, poor energy, and frequent awakenings at night. He

11

discussed impulsive past outbursts.  The plaintiff also complained of abdominal pain, diarrhea (1-2 times per day), constipation, and pain and tenderness in the right lower quadrant, radiating to his back and hips.  He remained in the hospital for 10 days until he was discharged on November 2, 2001.  The plaintiff stated he felt "useless" and noted that the best way the doctors could help him was to discharge him so that he could kill himself. His mental health case manager stated that he had undergone an MMPI that demonstrated borderline and histrionic personality organization.  He noted that the plaintiff's clinical presentation was quite consistent with a fairly morbid cluster B personality disorder.  He was assessed as a severe suicide risk with unstable depression.  He had potential for self-harm due to unstable living situation.  Outpatient psychopharmacotherapy was recommended. On October 31, 2001, the plaintiff was still resigned to suicide.  Stressors continued to be recent eviction, separation from wife, homelessness, unemployment, and lack of money. He expressed general pessimism and hopelessness regarding the future and his ability to stay employed, given his Crohn's Disease and frequent appointments.  On October 31, 2001, the plaintiff underwent an upper GI series which revealed a sliding hiatal hernia and gastroesophageal reflux.  It was noted that he had been admitted three times before for suicidal ideation:  1998, 1999, and 2000 (Tr. 308-379).

On January 23, 2002, the plaintiff underwent a study of his abdomen which revealed thickening of midline loops of distal small bowel, of uncertain etiology and significance, which could be compatible with Crohn's.  Sigmoid diverticula was also noted (Tr. 539).

The plaintiff was diagnosed on January 24, 2002, with right-sided abdominal pain, likely secondary to small bowel chronic smouldering Crohn's (Tr. 537).

On February 12, 2002, the plaintiff presented with complaints of right-hand pain and swelling to hands and feet bilaterally which worsens during the day with standing (Tr. 525).  On February 27, 2002, he was noted to have twitching to the right side of his face

and jerking in his hands.  These episodes lasted 1-2 minutes several times a day but not necessarily every day.  Additionally, the plaintiff complained of blurry vision to the right eye for the past three to four years (Tr. 513).

The plaintiff returned on March 7, 2002, and was noted to have bloody drainage and pus from the perianal area despite his chronic use of Flagyl (Tr. 508).  On May 20, 2002, he continued to complain of perirectal swelling with blisters that pop sometimes releasing green and yellow pus and sometimes blood (Tr. 501).  On June 11, 2002, the plaintiff underwent surgery for this condition which revealed squamous mucosa, anal fistula which was excised, and ulceration with acute inflammation and granulation tissue consistent with anal fistula and Crohn's Disease (Tr. 483).

On July 02, 2002, the plaintiff presented complaining of increased visual hallucinations and poor sleep (Tr. 469).  On October 31, 2002, he reported increase in frequency of bowel movements, 4-5 times per day, with right-sided bloating (Tr. 460).

The plaintiff returned on February 13, 2003, distressed about ongoing problems with Crohn's Disease.  His mood was low and his irritability was high.  He stated that he felt that surgery and a possible colostomy were preferable to current bowel movements 14 times per day with abscesses, fistula, etc (Tr. 693).

Between March 16-18, 2003, the plaintiff was treated at MUSC.  He had presented with a history of psychiatric hospitalizations in 1998, 2000 and 2001 for suicidal ideation/homicidal ideation/depression.  He was hospitalized after a drug overdose. Commitment papers were signed, and patient was sent to the VA Hospital on March 18, 2003.  Discharge diagnoses included borderline personality disorder; depression with prior suicide attempt; Crohn's Disease; PTSD; GERD; and hypertension (Tr. 576-86).

On March 18, 2003, the plaintiff was transferred to the VA hospital status post overdose on Zyprexa and cyproheptadine three days prior.  The plaintiff had a fight with his wife and impulsively took the two bottles of medication.  He exhibited a depressed mood,

13

decreased sleep, decreased energy, decreased concentration, and auditory hallucinations. He had anhedonia, which he attributed to be being physically unable to participate in hobbies. The team tried to find alternative placement for him, but he was emphatic that he would kill himself under any circumstances and that there was no solution to his problem. He often repeated "my vows say til death do we part; so either I have to kill my wife or myself." He remained isolated. After reviewing the past admissions notes, it seemed clearer that the plaintiff had cluster B traits, specifically those of antisocial or borderline personality disorder. Additionally, he was developing a pattern of reactive disregard/self-harm/anger that were easily triggered by ordinary life stressors. He was discharged on April 1, 2003, with diagnoses of major depressive disorder with psychotic features, borderline personality disorder, Crohn's Disease, GERD, and hypertension. He was to continue his current medication regimen (Tr. 587-600).

On June 18, 2003, the plaintiff was found to have suffered a vascular event that explained his recent lost field of vision. This was associated with Crohn's Disease which had been acting up again for the prior three months (Tr. 637).

On October 30, 2003, the plaintiff underwent an endoscopy revealing Crohn's Disease and hemorrhoids. A loss of vascularity on the right colon was also noted (Tr. 627).

At the hearing on May 12, 2004, a medical examiner ("ME"), Jake Ginsberg, Ph.D., testified telephonically. The ME testified to having reviewed the plaintiff's record but expressed some confusion as to the relevant time period about which he was to offer his opinion. He also asked if there were any new developments since January that might be significant (Tr. 43). The plaintiff's attorney explained that the plaintiff had been admitted for inpatient psychiatric hospitalization on April 16, 2004, and discharged on May 5th of the same year (Tr. 44). She read the multi-axial diagnoses from the discharge summary which included: (1) Axis I - Adjustment Disorder with depressed mood; (2) Axis II - Personality Disorder; (3) Axis III - Crohn's Disease, Leukopenia, elevated liver function studies, and

chronic daily headaches; (4) Axis IV - severe medical and legal problems; and (5) Axis V - GAF score of 50 ( Tr. 44).

The ALJ then explained to the ME that the relevant time period for review was from March 2000 to the present.  The ME stated that the record before him was sufficient for him to render an opinion regarding this time period (Tr. 45).  He stated that he had a copy of a Listing of Impairments and he agreed that the plaintiff's mental impairments met the listing requirements for 12.04 Affective Disorder and 12.08 Personality Disorder (Tr. 46).  The ME based this opinion on the hospitalization notes from April of 2004.  He stated that from March of 2000 the plaintiff had at least three episodes of decompensation (Tr. 47).  The ME reviewed what could be construed as inconsistencies in the record and difficulties with VA diagnoses but expressed that, overall, the plaintiff's Borderline Personality Disorder was very severe, very persistent, and very difficult to treat (Tr. 49-50).  He noted parenthetically that the rate of successful suicide attempts in people suffering from Borderline Personality Disorder is the highest of all mental illnesses (Tr. 50).

The ME explained his understanding of "equivalence" to mean that "if an individual has a medical impairment that is severe, but does not meet one of the categories as they are outlined in the psychiatric review technique, they are said to have a disorder that is equivalent to a listing ..."  He reiterated his opinion that the plaintiff's mental impairments were severe enough to meet the requirements of Listings 12.04 and 12.08 (Tr. 51).  The ME explained his reasoning for finding that the consultative examiners understated the severity of the plaintiff's condition (Tr. 53).  Because the file did not contain the medical records from the VA hospitalization in 1998, he could not provide an exact opinion as to whether the plaintiff's mental impairments met the B criteria of the listings that far back (Tr. 55-56).  The ME testified that the file he had on the plaintiff was incomplete (Tr. 57), but that if the 1998 emergency room visit did in fact lead to a hospital admission, his opinion would be that the plaintiff's mental condition probably met the B criteria then as

well (Tr. 60).    The ME compared the notes taken by the consultative examiners and pointed out that there was a "shifting or changing up and down" of the limitations noted (Tr. 62).    He explained that what he was trying to establish was the plaintiff's baseline and expressed that this is where he felt a loss of function had occurred (Tr. 62).

## ANALYSIS

The ALJ found that the plaintiff suffers from the severe impairments of Crohn's disease and depression but that he retained the residual functional capacity to perform a reduced range of unskilled light work (Tr. 23, 26).  The plaintiff argues that the ALJ erred by failing to (1) include all of his functional limitations in the hypothetical question posed to the vocational expert; (2) conduct a proper listing analysis; and (3) conduct a proper credibility analysis.

The plaintiff contends that the ALJ failed to include all of his functional limitations in the hypothetical question posed to the vocational expert.  The Fourth Circuit Court of Appeals has held that "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  The questions, however, need reflect only those impairments that are supported by the record.  *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987).  The purpose of a vocational expert's testimony is to assist in determining whether jobs exist in the economy which a particular claimant could perform.  *Id.*  The ALJ, however, has great latitude in posing hypothetical questions and is free to accept or reject suggested restrictions, so long as there is substantial evidence to support the ultimate question.  *See Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986).

16

The ALJ asked the vocational expert to assume the following:

[T]his hypothetical individual retains the capability of lifting 20 pounds on an occasional basis, ten pounds on a frequent basis, can sit six of eight hours, stand six of eight hours, and walk six of eight hours. This individual would need a sit stand option. This hypothetical individual would be further limited in climbing, balancing, stooping, kneeling, crouching, crawling, and kneeling to occasional. This individual could do simple one, two step unskilled work. It would have to be a job that was non public. . . . It would have to be a low stress job and I recognize all jobs have inherent stress, I'm talking about a high production type of job . . . and this hypothetical individual could not work where it would require more than frequent coordination with co-workers. . . .

(Tr. 76-77). The vocational expert stated in response that such a person could not perform the plaintiff's past relevant work but could perform the jobs of tobacco sampler and carton packer (Tr. 77). When the plaintiff's attorney asked whether a person who had to go to the bathroom six to eight times a day could perform these jobs, the vocational expert testified that the jobs would be eliminated (Tr. 78).

The ALJ failed to include all of the plaintiff's impairments in the hypothetical. The medical evidence relating to the plaintiff's Crohn's disease and, more specifically, his chronic diarrhea, is overwhelming and clearly supported in the record (*see* Tr. 207, 211, 222, 234, 239, 294, 438, 443, 483, 508, 537, 539, 693), and the limitation should have been included in the hypothetical question. Based upon the foregoing, the Commissioner failed to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy, and the plaintiff should have been found disabled at step five of the sequential evaluation process. In light of this court's recommendation that the decision of the ALJ be reversed and benefits awarded on this basis, it is unnecessary for the court to reach the other errors alleged by the plaintiff.

## CONCLUSION AND RECOMMENDATION

The record does not contain substantial evidence supporting the Commissioner's decision denying the plaintiff disability benefits.  Reopening the record for more evidence would serve no purpose.  *See Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).   Therefore, based upon the foregoing, it is recommended that the Commissioner's decision denying the plaintiff's application be reversed pursuant to sentence four of 42 U.S.C. §405(g) and that the plaintiff be awarded benefits.


                                                    s/William M. Catoe
                                                    United States Magistrate Judge

November 28, 2006

Greenville, South Carolina